The Honorable Bobby G. Wood State Representative 2806 Harrisburg Road Jonesboro, Arkansas 72401-8789
Dear Representative Wood:
This is in response to your request for an opinion on the constitutionality of Act 916 of 1995.
Act 916 imposes upon each resident of a school district failing to levy the "base millage," as defined therein, a surcharge of ten percent of such resident's state income tax liability. Act 916, § 2(a). Funds arising from the surcharge are to be distributed to each school district failing to levy the base millage in an amount equal to the difference between the amount that would have been available to the district for maintenance and operation if it had levied the base millage, and the amount so available from the millage actually levied by the district. Act 916, § 4.
Your request notes that the Constitution of Arkansas originally permitted the General Assembly to levy a property tax not exceeding two mills (later raised to three mills) for the support of schools, and that the adoption of Amendment 40 gave each school district authority to levy local property taxes for the support of schools and set no minimum level of required taxation. See Ark. Const. art. 14, § 3, and publisher's notes thereto. You ask how, in view of the current provisions of Ark. Const. art. 14, § 3, the General Assembly can establish a minimum millage rate without further amendment of the Constitution.
The fundamental law governing school finance is Ark. Const. art. 14, § 3, which, as amended, provides:
 The General Assembly shall provide for the support of common schools by general law, including an annual per capita tax of one dollar, to be assessed on every male inhabitant of this State over the age of twenty-one years; and school districts are hereby authorized to levy by a vote of the qualified electors respectively thereof an annual tax for the maintenance of schools, the erection and equipment of school buildings and the retirement of existing indebtedness, the amount of such tax to be determined in the following manner:
 The Board of Directors of each school district shall prepare, approve and make public not less than sixty (60) days in advance of the annual school election a proposed budget of expenditures deemed necessary to provide for the foregoing purposes, together with a rate of tax levy sufficient to provide the funds therefor, including the rate under any continuing levy for the retirement of indebtedness. If a majority of the qualified voters in said school district voting in the annual school election shall approve the rate of tax so proposed by the Board of Directors, then the tax at the rate so approved shall be collected as provided by law. In the event a majority of said qualified voters voting in said annual school election shall disapprove the proposed rate of tax, then the tax shall be collected at the rate approved in the last preceding annual school election.
 Provided, that no tax shall be appropriated for any other purpose nor to any other district than that for which it is levied.
Act 916 does not, on its face, establish a minimum millage rate. School boards retain their authority under Ark. Const. art. 14, § 3, to propose a millage rate lower than the base millage, and, in any district where it is proposed that the rate of levy be raised above the base millage, voters retain their authority to reject the proposed rate at the polls. Such actions will, of course, result in the imposition of the income tax surcharge upon the income taxpayers of the district, to the extent Act 916 is valid. It might be argued in general that a law imposing sanctions on a person[1] for his failure to take some action, even though the law does not expressly require the action to be taken, constitutes a requirement nonetheless. It accordingly might be argued here that Act 916 indirectly imposes a minimum millage requirement.
It is clear, both from the language of Ark. Const. art. 14, § 3, and from case law, that the General Assembly lacks authority to impose a minimum rate at or above which local school taxes must be imposed. The constitutional provision clearly delegates to the school board and the voters the authority and duty to determine the rate of the school district's tax levied in support of local schools. While the General Assembly is obligated to "provide for the support of common schools," the constitution gives the General Assembly no authority with respect to the setting of the rates of local school taxes. Thus, in Henry v. Tarpley,230 Ark. 722, 324 S.W.2d 503 (1959), the court held unconstitutional under Ark. Const. art. 14, § 3, an act of the General Assembly that purported to require school districts to allocate a portion of their school taxes, expressed as a millage rate, to the County Equalizing School Districts whose creation was authorized by the act. The provision clearly would have had the effect of requiring districts to levy school taxes at or in excess of the specified rate. The court characterized Amendment 40 as follows:
 Amendment 40 specifically places the amount needed to operate a school district in the hands of the voters of such district and removes all financial restrictions as to their powers in determining these amounts deemed necessary by the Board of Directors of the District. . . .
Henry, 230 Ark. at 727.
It was also stated in Henry, and it is settled law, that the General Assembly cannot do indirectly what it is prohibited by the constitution from doing directly. Henry, 230 Ark. at 727, quoting Hart v. Wimberly,173 Ark. 1083, 1089, 296 S.W. 39 (1927). See also Gravett v. Villines,314 Ark. 320, 862 S.W.2d 260 (1993) (applying the rule to the actions of a quorum court); Cragar v. Thompson, 212 Ark. 178, 205 S.W.2d 180
(1947).
Does Act 916 indirectly impose a minimum millage requirement upon school districts and therefore violate Ark. Const. art. 14, § 3? Several factors and principles of law may be relevant to answering the question.
The act imposes a financial consequence upon the income taxpayers of a district that fails to levy the base millage, and refers to that consequence as a "sanction." Act 916, § 5. The existence of a sanction or penalty for failure to comply with a statutory provision is sometimes cited as one factor that will lead a court to conclude that the provision is mandatory rather than directory. See 82 C.J.S. Statutes § 376 (1953), 73 Am. Jur. 2d Statutes § 20 (1974), and cases cited therein. If a court viewed the surcharge as a penalty for failing to levy at least the base millage, it might conclude that Act 916 indirectly sets a minimum millage requirement and constitutes an attempt to require indirectly what the General Assembly cannot require directly.
It might be noted, on the other hand, that a number of districts apparently failed to levy at least the base millage in the school election held in September 1995. One might cite this fact to argue that the surcharge is not punitive, but merely gives residents of each district a choice of how they will support their local schools: through local school taxes or increased income taxes. The act might be characterized as one of several devices employed by the General Assembly in carrying out its constitutional obligation to "provide for the support of common schools by general law. . . ." Ark. Const. art. 13, § 4. "Ultimately, the responsibility for maintaining a general, suitable and efficient school system falls upon the state." Dupree v. Alma School Dist. No. 30,279 Ark. 340, 349, 651 S.W.2d 90 (1983). In Dupree, the court quoted with approval from a New Jersey case:
 Whether the state acts directly or imposes the role upon the local government, the end product must be what the constitution commands. [When a district falls short of the constitutional requirements], whatever the reasons for the violation, the obligation is the state's to rectify it. If local government fails, the state government must compel it to act, and if the local government cannot carry the burden, the state must itself meet its continuing obligation.
Dupree, 279 Ark. at 349, quoting Robinson v. Cahill, 303 A.2d 273, 295
(N.J. 1973) [emphasis added].
While it is impossible to predict with certainty how a court would characterize the surcharge, it is my opinion that Act 916 probably is not unconstitutional as an indirect minimum millage requirement in violation of Ark. Const. art. 14, § 3. Every statute enjoys a presumption of constitutionality and all doubts are resolved in favor of the statute.Williams v. State, 320 Ark. 211, 895 S.W.2d 913 (1995). The act does not expressly direct school districts to levy at least the base millage, and the voters of several districts have in fact opted to support local schools through increased income taxes rather than increased local property taxes.
There is an inherent tension between the provisions of our constitution giving school districts control over local school funding and those providing that the state is primarily responsible for supporting the public schools. In view of this tension, Act 916 does not, in my opinion, appear to be an unreasonable way for the state to proceed. The act encourages districts to fund their schools at levels deemed necessary by the General Assembly in view of the state's constitutional obligation, expressed in Dupree and reaffirmed in Magnolia School Dist. No. 14 v.Arkansas State Bd. of Educ., 303 Ark. 666, 799 S.W.2d 791 (1990), to provide equality of educational opportunity. If the necessary support is not forthcoming notwithstanding such encouragement, the act provides a mechanism for the state to raise the necessary funds. It is clear that the General Assembly has authority to impose a uniform, statewide tax to fund the public schools. The fact that the state chooses to raise the funds necessary to satisfy its own legal obligations from those districts that directly or indirectly cause the state's burden to be increased should not, in my opinion, cause Act 916 to be deemed unconstitutional as a minimum millage requirement.
Your request also cites Ark. Const. art. 14, § 2, which provides:
 No money or property belonging to the public school fund, or to this State for the benefit of schools or universities, shall ever be used for any other than for the respective purposes to which it belongs.
With respect to this provision, you ask:
 Does this mean that if appropriated by any and all means, then the money is earmarked for education and it must go to its respective (each and every district) destination as existing law and previous policy and practice has established?
Act 916 provides that revenues arising from the surcharge will be deposited in the public school fund before they are distributed to the districts failing to levy the base millage. See Act 916, § 4. I take your question to concern whether the constitution prohibits the state from allocating these amounts to some, but not all, school districts.
In my opinion, Ark. Const. art. 14, § 2, does not prohibit Act 916's allocation of amounts arising from the surcharge to some, but not all, districts. The constitution merely prohibits the use of amounts in the public school fund for purposes other than those to which they belong. Act 916 has as one of its purposes the generation of funds to distribute to certain school districts, and funds arising under the act therefore "belong" to that purpose. The court in Magnolia School Dist. held constitutional certain distributions to fewer than all school districts.
Your request also cites the last paragraph of Ark. Const. art. 14, § 3, which is set forth above and which is to the effect that no "such tax" may be appropriated to any purpose or district other than that for which it is levied. Act 916 in no way appropriates any amounts arising from local school taxes to any purpose or any district; amounts raised under such taxes continue to be under the control of the local school board. With respect to amounts arising from the surcharge, it is my opinion that the constitutional prohibition does not apply to such funds, but only to funds raised from local school taxes. See McCall v. Armstrong,199 Ark. 1131, 137 S.W.2d 241 (holding the provision inapplicable to general county taxes). Even if the provision were held to apply to amounts raised by the surcharge, it appears that, under the act, all such funds will be appropriated for the purpose and to the districts for which they were levied (i.e., for operation and maintenance expenses of the districts failing to levy the base millage). See Act 916, § 4.
You ask whether the imposition of the surcharge will abolish the existing local-millage method of school finance because the surcharge constitutes "a new method of funding for public education." In my opinion, the imposition of the surcharge will not have any effect upon the local school financing method set forth in Ark. Const. art. 14, § 3. As noted above, the General Assembly has a constitutional duty to provide for the support of the public schools. This duty exists alongside the constitutional scheme for local school funding through local property taxes. The constitution clearly provides, therefore, that mechanisms used by the General Assembly to carry out its duty to provide support to the schools will coexist with local school funding through property taxes, as they have in fact for many years.
Finally, you ask how it is possible under current law "to place a penalty on any school district which does not comply with a law that is not established as an amendment to the existing constitution." The legislative power of the state is vested in the General Assembly. Ark. Const. art. 5, § 1. The state is required to maintain a public school system, Ark. Const. art. 14, § 1, and the General Assembly is required to provide for the support of the public schools, Ark. Const. art. 14, § 3. These provisions clearly authorize the General Assembly to impose a tax to support the schools, and a law imposing such a tax will be valid unless it contravenes some other constitutional provision.
Because your request inquires generally about the constitutionality of Act 916, it is appropriate to discuss two other theories under which the validity of Act 916 might reasonably be questioned.[2]
First, it is obvious that the act makes distinctions among individual taxpayers based upon their residence. People otherwise similarly situated will, under the act, pay state income tax at different rates based solely upon whether they live in a school district whose voters have failed to levy the base millage. It could be argued that the government's disparate treatment of otherwise similarly situated individuals constitutes a violation of the constitutional guarantee of equal protection of the laws found in U.S. Const. amend. 14, § 1, and similar provisions found in Ark. Const. art. 2, §§ 2, 3, and 18.
School funding legislation and tax legislation challenged on equal protection grounds are both reviewed under the rational basis test.Magnolia School Dist., 303 Ark. 666 (school funding legislation; the court expressly rejected an argument that strict scrutiny should be applied); Streight v. Ragland, 280 Ark. 206, 655 S.W.2d 459 (1983) (tax legislation). Under the test, the statute challenged is presumed to have a rational relationship to a legitimate governmental goal, and the challenger has the burden of proving that the statute is not "rationally related to achieving any legitimate objective of state government under any reasonably conceivable state of facts." Streight, 280 Ark. at 214
(emphasis in original).
In my opinion, it is unlikely that Act 916 would be held unconstitutional on equal protection grounds. It appears that the act has at least two legitimate governmental objectives: to encourage school boards and district voters to propose and approve local school taxes in amounts deemed necessary and appropriate by the General Assembly in view of the state's obligation to provide equality of educational opportunity; and, in the event districts do not do so, to raise the necessary funds through other means and from a group closely approximating those who have failed to impose upon themselves taxation sufficient to provide adequate school funding. It appears that drawing a distinction, for purposes of the imposition of the surcharge, between residents on the basis of whether their districts have approved the base millage is rationally related to the achievement of those objectives: the prospect of paying the surcharge should encourage boards and voters to propose and approve millage rates at or above the base millage; and the actual imposition of the surcharge can reasonably be expected to supply the funds necessary to provide the additional amount that would have been realized through the levy of the base millage.[3]
Finally, certain aspects of the legislative proceedings by which Act 916 was enacted might reasonably be challenged.
The bill that became Act 916, HB 1739, was originally entitled "An act to amend Arkansas Code 26-51-501 to provide an additional dependent tax credit for tax year 1996; and for other purposes." The bill contained a single substantive section, which would have provided an additional tax credit for those taxpayers already claiming tax credits for dependents under A.C.A. § 26-51-501(a)(3) (Supp. 1993). It also contained sections providing for codification, severability, and repeal of conflicting laws.
After introduction, the bill was amended to clarify its application to tax year 1996, to make the credit available for tax year 1995, and in certain other respects that are not relevant here. These amendments did not alter the bill's general purpose of providing an additional income tax credit for individuals already claiming tax credits for dependents.
Later in the session, however, and apparently after the expiration of the time permitted by rules of the House of Representatives during which new bills could be introduced, HB 1739 was amended to delete all references to a tax credit, and to provide for the income tax surcharge mechanism ultimately adopted, and was signed into law as Act 916. The amended bill was entitled "An act to levy an individual income tax surcharge for the equalization of public school funding; and for other purposes." New sponsors were substituted for the bill's original sponsor.
Arkansas Const. art. 5, § 21, provides:
 No law shall be passed except by bill, and no bill shall be so altered or amended on its passage through either house [of the General Assembly] as to change its original purpose.
The Supreme Court of Arkansas has interpreted this provision in several cases. In Loftin v. Watson, 32 Ark. 414 (1877), the court considered a bill that originally had the purpose of making county warrants and similar instruments receivable in payment of county taxes and other debts to the county without regard to the dates of the warrants or the purposes for which they had been issued. The bill was amended to limit the county debts for which warrants could be accepted, and to afford similar treatment of city warrants for municipal taxes and debts. The court, after quoting a dictionary's definition of the word "purpose," cautioned against too strict an interpretation of Ark. Const. art. 5, § 21:
 Though the provision of the Constitution be mandatory, it should not receive so rigid or narrow a construction as to embarrass or hamper the two houses in amending and perfecting their bills, and drive them to accomplish, by a number of bills, that which might well be accomplished by amending a bill, without adding foreign or incongruous matters, or perverting its original purpose.
Loftin, 32 Ark. at 421-422.
In referring to Ark. Const. art. 5, § 34, which prohibits the introduction of new bills during the last three days of a legislative session, the court also explained the reason for Ark. Const. art. 5, §21:
 Now, but for sec. 21, the force and intention of this section might be avoided during the last three days of the session, by taking up bills previously introduced for purposes indicated in their titles, and expressed in their bodies, and converting them, by amendment, into bills for totally different purposes, or engrafting upon them provisions foreign to their original purposes.
Loftin, 32 Ark. at 422. The court concluded that limitations upon acceptance of warrants, and the expansion of the statutory scheme to include municipalities, were "kindred" to the original subject of the bill, and that there was no constitutional violation.
In Hickey v. State, 114 Ark. 526, 530, 170 S.W. 562 (1914), the court described the purpose of Ark. Const. art. 5, § 21, as "to forbid amendments which [should] not be germane to the subject of legislation expressed in the title of the act which it purports to amend."
In Reitzammer v. Desha Road Improvement Dist. No. 2, 139 Ark. 168,213 S.W. 773 (1919), the court considered a bill whose amendment had stripped out all of its substantive provisions and substituted others. The plaintiff did not show, however, or even argue, that the original purpose of the bill had thereby been changed. The court held that such wholesale amendments are not unconstitutional provided they are germane to the original purpose.
Cone v. Garner, 175 Ark. 860, 3 S.W.2d 1 (1927), involved a bill whose original purpose was to abolish township boards of assessment and to create boards of equalization in populous counties. An amendment added a provision for the payment of assessors' expenses. The court held that the amendment was germane to and did not change the purpose of the bill, stated to be the assessment of property.
Matthews v. Byrd, 187 Ark. 458, 60 S.W.2d 909 (1933), involved a bill fixing the compensation of county officers. The original version of the bill contained an emergency clause stating that its purpose was the reduction of the costs of government. The bill was amended to eliminate a requirement to publish delinquent land records in favor of merely permitting public inspection of the records, and to relax the requirement to publish notices of impending sales of delinquent land. The court stated:
 Like all other legislation, the General Assembly has a discretion, not to change the purpose of the bill, but to determine whether an amendment does change the purpose, and a legislative act will not be declared unconstitutional as violative of [Ark. Const. art. 5, § 21] unless it obviously appears that the amendments adopted do change its original purpose.
Matthews, 187 Ark. at 464. The court concluded that the purpose of the bill was cost reduction and that the amendments therefore were germane to the purpose. A similar case is Vincenheller v. Reagan, 69 Ark. 460,64 S.W. 278 (1901), where it was held that, with respect to a bill providing for the support of the University of Arkansas, an amendment abolishing an office (and therefore eliminating an expense), "related to, and tended to aid in, the general object of the act indicated in its title. . . ."Vincenheller, 69 Ark. at 473.
Finally, in Wasson v. Planters' Bank Trust Co., 188 Ark. 343,65 S.W.2d 528 (1933), the court upheld an act to facilitate state bank membership in the FDIC that was amended to add provisions addressing liabilities of bank stockholders and evidences of claims against banks. The court stated that the amendments did not change, but rather clarified and made certain, the original purpose.
The Supreme Court of Arkansas apparently has never invalidated an act of the General Assembly as violative of Ark. Const. art. 5, §21.
Originally, HB 1739 had as its purpose the conferring of an additional tax credit to certain individuals. Its enactment would have had the effect of lowering income tax revenues to the state. It did not address school funding. As amended, HB 1739 had as its purpose the imposition of an additional tax to support certain public schools, and its enactment ultimately will result, if Act 916 is valid, in an increase in income tax revenues to the state.
The original bill and the amended bill were similar, however, in that both were intended to change the amount of state income tax payable by certain individuals. Although some of the reported cases state that an amendment may not change the purpose of the original bill as stated inits title, it is clear that the original title does not control the question of whether an amendment is germane. Matthews, supra. This being the case, it might be argued that HB 1739 was for the general purpose of making a change in the state income tax and therefore that the amendment did not change that purpose.
Although the court has provided little guidance on the meaning of "purpose" as used in Ark. Const. art. 5, § 21, one source contains the following definition:
 The "purpose" of a bill pending in the legislature, within the meaning of [a constitutional provision like Ark. Const. art. 5, § 21] is the general purpose of the bill, not the mere details through which and by which that purpose is manifested and effectuated.
73 Am. Jur. 2d Statutes § 55 (1974).
Under such a definition, it likely would be permissible, for example, for a legislature to amend a bill originally providing for a new tax credit for certain individuals by substituting a provision reducing the rate of tax imposed upon the same or a similar group of individuals. Both bills would serve the general purpose of reducing the amount of taxes paid by the group, though the details by which the purpose is manifested and effectuated are different. It might appear to stretch the definition of "purpose," however, when the same bill is amended by substituting a provision increasing taxes. It might be argued that the bill's general purpose has changed; a tax reduction has become a tax increase.
It might be argued that the provisions added to HB 1739 in substitution for its original provisions were "foreign or incongruous matters," thereby "perverting [the bill's] original purpose." Loftin,32 Ark. at 422. In my opinion, therefore, an argument can be made challenging the constitutional validity of Act 916. As noted above, however, the Supreme Court of Arkansas has apparently never invalidated an act under Ark. Const. art. 5, § 21, and the issue can be settled definitively only by a court having jurisdiction of a case properly presenting the question.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General J. Madison Barker.
Sincerely,
WINSTON BRYANT Attorney General
WB:JMB/cyh
[1] I note, but do not ascribe determinative significance to, the fact that Act 916, in imposing the surcharge, affects a group (income taxpayers residing in a district failing to levy the base millage) that is not precisely coextensive with the group failing to propose or approve the base millage (the school board or the voters of the district). It is not generally deemed significant that there is likewise not complete identity between the voters of the district and the property taxpayers of the district.
[2] In Dunklin v. McCarroll, 199 Ark. 800, 136 S.W.2d 675 (1940), an income tax was challenged on the basis that Ark. Const. art. 16, § 5, requires that all state taxation be "equal and uniform throughout the State." The court disagreed, holding that provision applicable only to property taxes. As the surcharge imposed by Act 916 clearly is an income tax, not a property tax, it is my opinion that Ark. Const. art. 16, § 5, is not applicable to the surcharge.
[3] If the classification made by the act satisfies the rational basis test, it is also not a local or special act in violation of Ark. Const. amend. 14. Fayetteville School Dist. v. Arkansas State Bd. of Educ.,313 Ark. 1, 852 S.W.2d 122 (1993).